F. W. McClain, Appellant, v. O. M. Roberts et al., Appellees.

SPECIFIC PERFORMANCE: Extent of Right. A vendor may not enforce specific performance for an acreage in excess of that to which the record shows he has good title.

*Appeal from Jefferson District Court.*—F. M. Hunter, Judge.

April 8, 1922.

Rehearing Denied December 15, 1922.

Action in equity, in which plaintiff asked specific performance of a contract to sell land. Defendants also asked for a specific performance. There was a decree for the defendants on their cross-petition. Plaintiff appeals.—*Modified and affirmed.*

*Thoma & Thoma,* for appellant.

*Roberts & Webber* and *Starr & Jordan,* for appellees.

Preston, J.—The real controversy between the parties is, as we view the record, in regard to 1.55 acres of land. In all probability, there would have been no controversy, even over the 1.55 acres, but for the collapse of the Iowa land boom. There is little, if any, dispute in the record. The case is peculiar in some respects. At the time of the execution of the contract,

and at the time plaintiff, as the vendee of the land, commenced his action for specific performance, this and other lands were increasing in value, and plaintiff desired the land. The contract was not to be performed for some eight or nine months after it was executed. When defendants filed their cross-petition asking for specific performance, and at the time of the trial, land values were going down, and defendants, vendors, were anxious to sell, and plaintiff was not so strongly desirous of carrying out the sale. The parties switched positions. The plaintiff claims that, by amendment to his pleadings, he abandoned his plea for specific performance; but the claim is not borne out by the record. In one of the amendments to the petition, filed about November, 1920, some eight or nine months after the date at which the contract was to have been completed, plaintiff asked judgment for the down payment made by him, and for damages for the difference between the contract price for said land and its market value on March 1, 1920; but nowhere in any of his pleadings did he withdraw his prayer for specific performance and for general equitable relief. On the contrary, in the different amendments to his petition and in the reply or answer to defendants' cross-petition, he prayed as in his original petition. The prayer of the original petition is as follows:

"Wherefore this plaintiff renews his tender as hereinbefore set out, and asks the court to decree specific performance of said contract as against said defendants, and to render judgment against defendants for damages for their failure to perform at the proper time, and for such other and further relief as may be equitable in the premises."

Such was the state of the pleadings at the time of the trial, and at the time the decree was entered below, and as they are now. By the contract, defendants agreed to sell, and plaintiff to buy, 128.05 acres. The petition further alleged that defendants were unable to perform their contract for land in excess of 126.50 acres, and that plaintiff tendered performance on his part as to that quantity of land, and demanded performance by defendants, so far as they were able to perform.

It seems to us that this is somewhat out of the ordinary in an action for specific performance, and that plaintiff in a sense abandoned specific and exact performance as to the full num-

ber of acres; and the claim which he now makes and relies on is that the abstract of title did not show a good and merchantable title, as required by the contract. However this may be, the defendants did in fact own 128.05 acres. There were that many acres there, and defendants tendered a deed for that number of acres; and we think that, under the record, the abstract which plaintiff permitted defendants to amend and bring down shows that fact. The trial court so found. The plaintiff got all he asked, and all his contract called for. It appears that plaintiff and defendants entered into a written contract on June 23, 1919, by which defendants were to convey to plaintiff, on March 1, 1920, the west 128.05 acres of the southwest fractional quarter of Section 30-71-9, at $290 per acre: $2,000 down; $15,134.50 cash on March 1, 1920; and the balance by note, secured by mortgage back upon the land. Defendants were to convey the land to plaintiff by a good and sufficient warranty deed, and deliver to plaintiff an abstract of title showing a good and merchantable title. Defendants admitted the execution of the contract, and say they did tender to plaintiff a good and sufficient warranty deed and an abstract showing title as required, and that they have at all times been ready, able, and willing to perform on their part; and they ask specific performance as against plaintiff. The deed to defendants when they purchased the land deeds the west 128.05 acres.

It appears that, in 1838, an original entry of the quarter section was made by one Benedict; and in 1841, a patent was issued to him. Both the original entry and the patent describe the land as a fractional quarter section, containing 165.82 acres. Surveys made afterwards showed that, in fact, it contained 171.55 acres. Different conveyances were made, until the title became vested in parties named Hollister. That was prior to January 24, 1874. On the date last mentioned, the Hollisters partitioned the quarter section by mutual conveyances among themselves, whereby the title to the east 43.50 acres, which became a separate farm, was vested in one Hollister, and the title to the west part, supposed to contain 126.50 acres, was vested in another Hollister. This west part also became a separate farm. Later, the title to the east farm, of 43.50 acres, became vested in one Carlson, who owned it on March 1, 1920. The

title to the west portion had become vested in Chatterton, prior
to 1886. The Chattertons conveyed to the defendants by war-
ranty deed, and they owned it on March 1, 1920. As said, the
deed to the defendants conveyed 128.05 acres. Up to that time,
the part of the farm conveyed to Hollister in January, 1874, was
described as 126.50 acres off the west side. At the time the Hol-
listers made the division of the quarter section among them-
selves, they mutually agreed upon the line of division between
the east 43.50 acres and what was supposed to be 126.50 acres
to the west. The line was evidenced by a division fence. From
that time to the time of the trial, all parties owning land on
both sides of the line maintained and recognized the line fence
as the true division between the said farms, and acquiesced
therein. Prior to the time the west part of the Hollister farm
was conveyed to defendants, the Chattertons, defendants' gran-
tors, had become convinced that there were more than 126.50
acres in the farm. The Chattertons sold the farm to defendants
under a contract whereby defendants agreed to pay a stipulated
amount per acre for the actual number of acres in the farm,
when established by a proper survey. Prior to the deed to de-
fendants, the parties had the county engineer make a survey
of the land and a plat thereof, which was duly prepared and
certified by the county engineer and filed of record. That sur-
vey and plat showed the actual acreage of the west portion to be
128.05 acres, which, with the east portion of the section, con-
taining 43.50 acres, makes the total 171.55 acres, the amount
of land which was actually there, as shown by the survey. The
abstract of title was continued and amended so as to show said
survey and plat and the entire history of the title to the land.
As said, defendants prepared and tendered to plaintiff a deed
to the entire 128.05 acres, and an abstract setting out the fore-
going survey and plat and affidavits and the entire history of the
record title from the government down. The owners of the east
portion never did claim more than 43.50 acres.

About the time plaintiff entered into the contract with de-
fendants to purchase the west part of the fractional quarter, he
also entered into a similar contract with the owner of the east
43.50 acres to purchase the same from him, and both deals were
to be closed on March 1, 1920. At that time, Carlson, the owner

of the east 43.50 acres, and the defendants together owned the entire quarter section, containing 171.55 acres; so that, if plaintiff gets and pays for 128.05 acres from defendants and 43.50 acres from the Carlsons, he gets and pays for 171.55 acres, the exact amount of land contained in the fractional quarter section. If he receives from Carlson title to 43.50 acres, and pays for that amount, but only 126.50 acres from defendants, he gets all the land and pays for only 170 acres, although he would receive title to the full number of 171.55 acres. Putting it another way, deducting the Carlson part to the east, 43.50 acres from 171.55 acres leaves 128.05 in the west part, which is the amount called for in the contract, and the amount conveyed to defendants in their deed and in the deed tendered by defendants to plaintiff.

It should have been before stated that plaintiff claims that defendants had title to only 122 and a fraction acres. They arrive at this, as we understand it, by deducting the 43.50 acres in the east portion from the 165.82 described in the patent from the government; but, as said, they concede in their pleadings 126.50 acres. All the parties, including Carlson, met at an office on March 1, 1920, each side claiming to be ready to close the deals. Carlson claimed only the 43.50 acres east of the division fence. At that time, parties holding mortgages on the premises were present, and were ready and willing to accept their pay and release the mortgages and to make the abstracts so show at the time of closing the deal with plaintiff. The only objection made by plaintiff at that time was that defendants could not convey or give merchantable title for the full amount. The parties split on that proposition. Thereafter, plaintiff brought his suit for specific performance, and defendant asked specific performance. It seems that the real question in the case was whether or not defendants were entitled to receive pay for the full 128.05 acres, or for the amount claimed by plaintiff. Defendants contended that there were 128.05 acres of their land; their deed showed that many acres; the survey and plat which was of record showed that many acres; Carlson, who was present, and agreed with them in the matter, claimed only 43.50 acres east of the division fence; and he was the only one who could claim any other part of the quarter section. The

government, by the original entry and patent, had parted with its ownership in the entire quarter section, even though there was more in it than the number of acres mentioned. Code Section 2912 provides that:

"All persons owning real estate not held by an adverse possession shall be deemed to be seized and possessed of the same."

Section 2914 provides that:

"Every conveyance of real estate passes all the interest of the grantor therein, unless a contrary intent can be reasonably inferred from the terms used."

Section 2957 provides that:

"* * * Affidavits explaining any defect in the chain of title to any real estate may be recorded as instruments affecting the same."

Other sections of the statute provide for recording of such instruments, surveys, plats, and so on. See Code of 1897, Sections 534 and 2935.

Appellees contend that the affidavits merely explain defects in the title; while appellant contends that the question is not one of defect, but that defendants attempted to supply a link in the chain of title as to certain acreage, in the form of affidavits. Appellant's contention is not quite accurate, perhaps The title to the entire fractional quarter, though by actual survey there was a larger number of acres than described in the patent, had passed from the government to the subsequent owners, as to all the land there was. Title could not be quieted in the government. Somebody got title to the land under the patent. Defendants and their grantors for about 50 years claimed the entire acreage shown to have been actually contained in the fractional quarter. Defendants and their grantors claimed the 128.05 acres to the west, and this under the original grant and under the survey and plat showing that number of acres in the west portion, which plat and the affidavits explaining the defects were of record, and were shown on the abstract. Appellees contend that claim of title based upon an agreement to a boundary line is different from a claim of title based upon adverse possession. On this point, they cite *Miller v. Mills County,* 111 Iowa 654; *Keller v. Harrison,* 151 Iowa 320; and

other cases. It is doubtless true, as contended by appellant, that, under cases cited by him, abstract of title has reference to the record title; and that title by adverse possession may not be made or supplied and made of record by affidavits; and that, even though the title be in fact good, the contract is not complied with unless the abstract so shows. It may be conceded that, generally speaking, this is the rule. But the record in the instant case is peculiar in some respects. Though appellant now relies upon the provision in the contract that defendants were to furnish an abstract showing good and merchantable title, that was not his theory of the case in the trial below,—at least, not entirely so. He was then and is now, so far as the pleadings are concerned, demanding performance by defendants *so far as they were able to perform,* and as to *that quantity* of land, to wit, 126.50 acres, although at the same time alleging that defendants were unable to perform in excess of that amount.

Other circumstances have a bearing, but we shall not stop to repeat them now. Other questions are argued, but the foregoing discussion is decisive of the case. I would affirm. Justice Weaver is of like mind; but a majority of the court are of opinion that defendants are entitled to specific performance as to only 126.50 acres, and that defendants may retain the remaining 1.55 acres of the 128.05 acres. The decree is so modified, and affirmed in all other respects. The clerk will tax the costs of appellees' printing to them, and all other costs to appellant.—*Modified and affirmed.*

STEVENS, C. J., WEAVER, EVANS, ARTHUR, and FAVILLE, JJ., concur.